**SMITH, Jr., Appellant v SMITH, Appellee.**

Ohio Appeals, 1st District, Hamilton County.

No. 6243. Decided July 6, 1943.

J. Louis Warm, Cincinnati, and James B. O'Donnell, Cincinnati, for appellant.

Peck, Shaffer, Williams & Gorman, Cincinnati, for appellee.

## OPINION

By MATTHEWS, J.

This is an appeal on questions of law from the Court of Common Pleas of Hamilton County. That court found that neither party was in a position to invoke relief and, therefore, refused to make any declaration concerning or disturb in any way, the situation in which the parties had placed themselves. The opinion of the court is reported in 23 OO 283, and 44 N. E. (2d) (9 Ohio Supp. 49). Both parties were dissatisfied with that hands-off attitude and have appealed to this court.

The record discloses that the defendant Ruth Kuh Smith (nee Rosenthal) was married to one Julius S. Kuh at Atlantic City in the state of New Jersey on the 30th day of June, 1929. At that time both were residents of that state and continued to be residents thereof until the defendant removed to Ohio shortly after December 14th, 1933, with exception of a short period when defendant resided in Pennsylvania.

The defendant and Julius S. Kuh separated in September, 1932 and have not lived together as husband and wife since. One child—a son—had been born of the marriage. The father agreed that the mother should have the custody of the child. Shortly after the separation, the defendant started to consider the desirability of securing a divorce from Julius S. Kuh and her advisers found that there were objections from their standpoint to the laws of New Jersey, where she and her husband resided, and they then investigated the laws of other jurisdictions, seeking a jurisdiction that afforded the easiest and speediest escape from the bonds of matrimony. She finally selected the Republic of Mexico as the jurisdiction in which to proceed. Attorneys were employed to represent her and her husband. An action for divorce was begun on Septem-

ber 11th, 1933, in which one of the attorneys appeared as the representative of the wife, who was the plaintiff, and the other appeared as the representative of the husband, who was the defendant They acted under written powers of attorney. The Mexican Court entered an interlocutory decree on October 7th, 1933, and on October 9th, 1933, the decree was made absolute.

During all of this time, Ruth Kuh and Julius S. Kuh resided in the state of New Jersey, except that after their separation, Ruth Kuh resided in the state of Pennsylvania, but had returned to the state of New Jersey before the plan to file suit for divorce in the Republic of Mexico was arranged. The employment of the Mexican attorneys was effected by correspondence and neither Ruth Kuh nor Julius S. Kuh was ever at any time in the Republic of Mexico.

The plaintiff in the action now before the court met the defendant for the first time on August 4th, 1933 in Atlantic City, New Jersey. He immediately proposed marriage to her and was told that she was married, but was considering filing an action for divorce which he undoubtedly urged her to do.

There is a dispute as to the extent of the plaintiff's participation in arranging for this Mexican divorce, but there is no doubt that he knew from the beginning that the divorce action had been filed there and that Ruth Kuh was continuously in the state of New Jersey and never in the Republic of Mexico. He was in constant communication with her at addresses in the state of New Jersey during all of that time.

On December 14th, 1933, the plaintiff, a resident of the state of Ohio, and the defendant, a resident of the state of New Jersey, went to Stamford in the state of Connecticut, went through a ceremonial marriage there, and almost immediately came to the state of Ohio, where they have resided since, and together as husband and wife until their separation in February, 1941.

This action was filed by the plaintiff seeking a declaration that the marriage ceremony between him and the defendant was and is null and void because the defendant had at that time, and ever since, a husband other than the plaintiff. His petition contains a prayer for injunction against the disposition of certain property by the defendant and for general relief.

The defendant denied that she had a husband at the time she went through the marriage cermony with the plaintiff, asserted the validity of the Mexican divorce decree. and by cross-petition sought divorce and alimony on the ground of gross neglect, extreme cruelty and adultery.

We have been aided very much by counsel in deciding the legal questions suggested by this state of facts. Many cases have been cited—too many, to permit detailed discussion of all of them.

(1) The first issue to engage us is the operative effect in the United States of the decree entered by the Mexican court. The

marriage status which it purports to dissolve did not arise under Mexican law, as the parties had never been in Mexico at any time, it had never existed because of that law and its recognition of the marital status, arising and continuing solely by virtue of the laws of New Jersey, was for the sole purpose of dissolving that relationship between persons who at the time owed it no obligation, duty, or allegiance, but, on the contrary, owed all their allegiance to the United States of America. Whatever recognition it is given by any State of the United States results from comity and not from any constitutional or treaty provision and there is no constitutional provision and we have been cited to no treaty provision.

Legislative, executive, and judicial writs can run only within the territorial limits of the sovereignty whose writ it is. Any attempt to project its authority beyond its own territorial limits would be an invasion of the sovereignty of another state or nation. In the nature of things jurisdiction is limited to persons and things within the territorial limits of the sovereignty and it cannot be exercised over persons or things that were never within the state or nation whose authority is asserted. The questions are whether a vicarious presence through an attorney will satisfy the rule and confer power to destroy a status created by another sovereignty, or whether the latter sovereignty will by refusal to denounce it thereby sanction the action of the parties in the circumvention of its laws.

We believe reason and authority support the view that a state or nation will accord no recognition or validity to the acts of nationals who seek to evade the restraints imposed by their own state or nation by invoking the action of another state or nation to which they owe no duty or allegiance, and that the action of such other country through whatever department—judicial or otherwise—will be given no recognition ex proprio vigore by the state or nation which created the legal relation it seeks to affect. It seems to us that a contrary holding pushes the rule of comity to the point of sanctioning the intrusion of a foreign power into the internal affairs of a nation. In distinguishing the case of Curry v Curry in Garman v Garman, (102 Fed. 2d) 272, 122 A. L. R. 1317, at 1319, the court said: "It does not appear herein that there was any misrepresentation of jurisdictional facts to the Mexican court and it does appear that the Mexican decree was void because neither of the parties was domiciled in Mexico nor personally present there." The facts in that case are almost identical with the facts in the instant case.

As the first marriage took place in New Jersey and the parties were at all times domiciled and personally present in that state or the state of Pennsylvania and as the second marriage took place in Connecticut it may serve some purpose to explore the law of those states to ascertain whether any recognition is accorded by either to a Mexican divorce obtained under such circumstances, or recognition given to the marriage ceremony performed in Connecticut.

(2) We have been referred to no New Jersey case directly upon this point, but we do find the general principle stated in Davis v Green, 91 N. J. Eq., 17, in a case where there was an existing marriage at the time the ceremonial marriage was performed that: "'The marriage here under consideration is absolutely void without the aid of any judicial decree to that effect." The other New Jersey cases cited (Bournonville v Cain, 104 N. J. Eq., 310; Margulies v Margulies, 109 N. J. Eq., 391, and Nichols v Nichols, 25 N. J. Eq., 60, as well as Davis v Green, are not cases involving divorce decrees entered in other jurisdictions where neither party was domiciled and the marriage status had no existence. The courts therefore, were not called upon to, and did not, consider the specific question of whether New Jersey would tolerate the avoidance of its public policy as expressed in its statutes by such action on the part of its citizens. The general statement lends no support to the view that it would countenance the renunciation by its resident citizens of its laws in favor of the laws of a foreign country.

(3) We have been cited to several Connecticut cases on this general subject.

The first paragraph of the syllabus to Gildersleeve v Gildersleeve, 88 Conn., 689, is: "One who seeks a divorce from a non-resident respondent must have acquired a bona fide domicile in the state in which the action is brought, otherwise, its courts are without jurisdiction of the res, that is, the existing marriage status."

We find no departure from that principle in any Connecticut case.

Roxbury v Bridgewater, 85 Conn. 502. and Northrop v Knowles, 52 Conn. 522, did not involve the question of the effect to be given to a divorce decree entered by a foreign court. They did involve the question of the sufficiency of the proof of a pre-existing marriage, rendering void a subsequent marriage ceremony, and the inferences or presumptions to be drawn from proven facts. In the case at bar we are not troubled by any such problem. The ultimate facts are admitted—the prior marriage in New Jersey, the Mexican divorce decree while both parties were domiciled and physically in the United States and neither domiciled in or physically present in Mexico, the fact that the husband is still living, and the marriage relation still existing unless dissolved by the Mexican decree. and the marriage ceremony in Connecticut between the plaintiff and defendant while both were residents and citizens of other states. Under such circumstances resort to inferences would be idle and their use either lead astray or to the admitted facts. Roxbury v Bridgewater, Ervin v English, and Northrup v Knowles have no application to the facts here presented.

In Foss v Foss, 105 Conn., 502, it was held as stated in the first paragraph of the syllabus, that:

"It is a prerequisite to jurisdiction over an action for divorce that. one of the parties be domiciled in the forum at the time when it is. commenced."

The case of Tyler v Aspenwall, 73 Conn., 493, is not at all inconsistent with this statement. The case did not involve the absence of jurisdictional facts. It was admitted that the court had jurisdiction. The weakness in the divorce decree was that it had been obtained through fraud and perjury. What the court held was that a stranger could not maintain an action to have the divorce decree set aside because of the fraud and perjury. In the case at bar the Mexican decree was entirely void. No decree setting it aside was necessary.. It did not dissolve the marital status created by the laws of New Jersey between citizens of that state. Tyler v Aspenwall is not inconsistent at all with Foss v Foss, supra.

(4) We have been cited to no Pennsylvania case holding valid and giving effect to a divorce decree to parties who had never been. within the territorial jurisdiction of the court at any time. The cases of Fitzpatrick v Miller, 129 Pa. Sup. Ct., 324, 196 Atl. 83; Blinn v Blinn, 122 Pa. Sup. Ct., 452, 186 Atl., 281, are predicated upon the nullity of such a decree.

So having reviewed the law of New Jersey, Connecticut. and: Pennsylvania, into whose domains the Republic of Mexico was invited by the institution of the divorce action, to extend the reign of its laws over citizens of New Jersey and Pennsylvania while continuously resident of those states, we conclude that there is nothing in the laws of those states that gives countenance to the thought that the laws or decrees of a foreign country are operative ex proprio vigore, or that they will be afforded a sanction as a matter of comity.

The reason for this uniformity is fundamental.

There is no possible basis for a state to yield jurisdiction under such circumstances. There could be no weighing of conflicting governmental interests and a yielding of the lesser interest in favor of the greater, as existed in such cases as Alaska Packers' Association v Industrial Accident Com., 294 U. S., 47, and Pacific Employers' Insurance Co. v Industrial Com., 306 U. S. 493. The Republic of Mexico never had any governmental interest in the marital status: of United States Nationals who had never been within the borders of Mexico.

We, therefore, conclude that the defendant was married to Julius Kuh at the time that she went through the marraige ceremony with the plaintiff in Connecticut. and, by reason thereof, she was ineligible to assume the marriage status with the plaintiff. and such ceremony was null and void according to the laws of New Jersey, Connecticut, and Pennsylvania.

The recent case of Williams v North Carolina, 317 U. S., 287. is not inconsistent with anything that we have said. It was not a case in which neither party was at any time as here within the

boundaries of the state whose court granted the decree. The plaintiff was present at the hearing and had been within the state for the time required by its laws and had acquired a bona fide domicile therein. The court expressly held as stated in the last paragraph of the syllabus that:

"The case does not present the question whether North Carolina has power to refuse full faith and credit to the Nevada divorce decree because they were based on residence rather than domicil, or because contrary to the findings of the Nevada court, North Carolina finds that no bona fide domicil was acquired in Nevada."

The court did overrule Haddock v Haddock, 201 U. S., 562, in which the court had held that a divorce decree obtained by a husband in a state in which he had acquired a bona fide domicile was not entitled to full faith and credit under Article IV of the United States Constitution in the state in which the marriage had been solemnized and in which the wife had had a continuous domicile. That has nothing to do with the question before the court in this case.

So we find that when the parties entered Ohio they brought with them no marital rights which Ohio was bound to recognize. The only status which Ohio was bound to recognize and accord full faith and credit was the marriage between the defendant and Julius S. Kuh.

(5) Now what is the law of Ohio as applied to this situation? We think that law is succinctly stated in 32 O. Jur., 273 and 274:— "The courts of one state have no jurisdiction over any marital offense or cause of divorce, wherever arising, unless one of the parties has an actual bona fide domicil within the state. Nor does it alter the case that the alleged marital offense was committed within the state where the divorce is sought, or that the parties submitted to its jurisdiction. What is wanting in such a case is jurisdiction over the subject-matter."

See also: 14 O. Jur., 536, et seq.

The syllabus to Van Fossen v State, 37 Oh St, 317, is:

"A decree of divorce under a statute of another state authorizing a divorce between husband and wife, neither of whom is domiciled therein, is of no force or effect in this state where the parties have their domicile."

And we conclude that this divorce had no more validity in Ohio than in the other states, that the defendant had a husband living at the time of the marriage ceremony with the plaintiff and that fact was a ground for divorce under §11979 GC. Nor was the invalidity of the Mexican divorce insulated by Connecticut recognizing the validity of the marriage ceremony in that state. Had Con—

necticut recognized the marriage as valid, it would be questionable whether the public policy of Ohio would approve. That is not the question here, because Connecticut did not recognize the validity.

(6) But it is said that the plaintiff is precluded from insisting upon this ground for divorce because of his knowledge of the circumstances under which the divorce decree was entered. It is said that his hands are not clean and that he is estopped to deny the validity of the divorce. Sec. 11979 GC, contains no such qualification of the right to insist upon the existence of a prior undissolved marriage as a ground for divorce. If it is a valid qualification the state's citizens are enabled by culpable conduct to renounce their allegiance to the marriage and divorce laws of their state and make effective within the state an act of a foreign country which the state has declared is null and void of its own proper force within the state. That Ohio as a sovereign state would not countenance an invasion by a foreign country of its own sovereignty or that of a sister state by such an artifice is supported by fundamental reasons. That it would refuse to give any relief based on the validity of the action of the foreign country is clear. Do the same considerations apply when one of the parties seeks to have the invalidity declared and the rights determined as though such void action had not occurred? It seems to us exactly contrary considerations control so far as vindicating the validity of a status created by our own laws is concerned.

In Garman v Garman, (102 Fed. [2d.] 272) 122 A. L. R., 1317, the court held as stated in the syllabus, that:

"Husband is not estopped in a suit in the District of Columbia for divorce upon allegations of wife's adultery not predicated upon subsequent marriage, to deny validity of a previous Mexican divorce which husband and wife joined in obtaining, apparently by 'mail order' when both were in the District, without any representation that they were otherwise domiciled, even if she believed that the Mexican decree was valid."

Speaking of the distinction between cases in which private claims or demands arising out of the pseudo-marital relation and those in which that status is directly involved, the court in Stevens v Stevens (273 N. Y., 153, 7 N. E. [2d], 26) 109 A. L. R., 1016. at 1017, said: "Here, the court was invoked to pronounce judgment directly upon the marital status—a relation which no stipulation or conduct of the parties could alter." And the court held there was no estoppel in such a case. That is the character of the case before us. In such a case none of the elements of estoppel exist. Both parties knew the essential facts—the defendant perhaps more of the details than the plaintiff, but so far as the doctrine of estoppel is concerned, there is no distinction. Whatever of ignorance existed

was as to the law. Neither was misled by the other as to the status of the defendant. Neither changed his or her position in reliance on any representation of the other. Presumably, at that time they both thought, but perhaps with grave misgivings, that the Mexican divorce had cleared the way for their marriage. At least, they hoped so. It would at least furnish the semblance of legality to a relation that would otherwise be frankly meretricious. So there being no basis for estoppel, the defense of unclean hands is interposed, based on the same facts. Stated in another way, it is said that the parties are in pari delicto, and, therefore, neither will be afforded any relief.

No matter how expressed this principle has no application to an action to have a marriage declared null or for divorce on the ground that the marital ties—real or apparent—should be dissolved on the ground that either had a spouse living at the time of the marriage ceremony.

In Davis v Greene, 91 Conn., 17, the court held, as stated in the syllabus, that:

"1. The general rule that where the parties are in pari delicto no affirmative relief will be given to one as against the other is always regarded by courts of equity as without controlling force in all cases in which public policy is considered as advanced by allowing either party to sue for relief against the transaction.

"2. A petitioner seeking annulment of her marriage to the defendant because at the time of such marriage she was the lawful wife of another man then living, which fact and that their marriage was consequently void was known to her and to the defendant, would not be denied relief as being in pari delicto, as though the marriage was void without any decree, the decree sought would merely operate to establish for all time the status of the parties, and would be granted in view of public policy, as in its absence the remarriage of the petitioner after the death of her present husband or the remarriage of the defendant might otherwise put in doubt the validity of lawful marriages and the legitimacy of lawful children."

The opinion in that case answers all the arguments against withholding relief.

The case of Querze v Querze (290 N. Y. 13) 47 N. E. (2d), 423, involves a Mexican divorce decree entered under circumstances similar to those in this case followed by a ceremonial marriage of one of the parties. In an action for divorce and alimony the Mexican decree and other acts were alleged as estoppels to assert the existence of the marriage relation. In denying any effect to the Mexican decree and the defense of estoppel, the court said:

"The learned Justice at Special Term relied upon Krause v Krause, 282 N. Y., 355, 26 N. E. 2d. 290, but there is nothing in that case which forms any authority for the decision which has been made in the case at bar. The facts in the instant case are such that the courts of this State can attach no validity to the Mexican decree of divorce. Vose v Vose, 280 N. Y. 779, 21 N. E. 2d. 616. No one disputes the invalidity of the Mexican decree. This court has held that a void foreign divorce decree will preclude the spouse who obtains it from asserting in our courts a private claim or demand arising out of the marriage. Starbuck v Starbuck, 173 N. Y. 503, 66 N. E. 193, 93 Am. St. Rep. 631; Hymes v Title Guarantee & Trust Co., 273 N. Y. 612, 7 N. E. 2d. 719. But we have consistently held that such a decree will have no effect upon the right of either spouse to a full adjudication in our courts upon the question of the existing marital status. Stevens v Stevens, 273 N. Y. 157, 7 N. E. 2d. 26; Davis v Davis, 279 N. Y., 657, 18 N. E. 2d. 301; Vose v Vose, supra; Maloney v Maloney, 288 N. Y. 532, 41 N. E. 2d. 934. Although there was no fact of remarriage in the Vose and Stevens cases, the fact of the subsequent remarriage or remarriages of the defendant in this case in reliance upon the Mexican decree does not change that rule. Krause v Krause, supra. Nor is that rule affected by the fact that the plaintiff is asking for alimony and counsel fees herein. That was the claim made by defendant in Vose v Vose, supra, and we held that the claim was without merit. The wife's right to alimony is not 'a private claim or demand' arising out of the marriage of the parties. That right comes from the statute and not from the common law. Romaine v Chauncey, 129 N. Y. 566, 571. 29 N. E. 826, 14 L. R. A. 712, 26 Am. St. Rep. 544. Such a claim in itself furnishes no foundation for a cause of action; it is a mere incident of the judgment in a matrimonial action. Galusha v Galusha, 138 N. Y. 272, 33 N. E. 1062; Fox v Fox. 263 N. Y. 68, 188 N. E. 160; Civil Practice Act, Sections 1169, 1170."

The relation between the parties contained a congenital defect that passage of time could not remove. The defendant had and has a husband other than the plaintiff. They cannot live together in Ohio as man and wife without violating the criminal laws and offending against the public policy of the state. They have ceased to live together and now ask the court to judicially declare that the marriage relation does not exist and has not existed between them. The court has jurisdiction to so decree and public policy and the mandate of the statute requires that it exercise that jurisdiction, so that the parties and the public may know their status. The decree of the court will do no more than judicially declare what already exists in fact.

In speaking of this principle it is said in 19 Am. Jur., 332, that:

"Since it is based on the principle that to give the plaintiff relief in such a case would contravene public morals and impair the good of society, the maxim should not be and is not applied in a case in which to withhold the relief would to a greater extent offend public morals.   *   *   *

"Furthermore, although the parties are shown to have been in pari de licto, the court will grant relief to one of them if its forebearance will be productive of an offense against public morals or good conscience.  A gaming contract, being considered to be violative of the policy of a public statute, will often be set aside in equity at the instance of a particeps criminis.  In such a case the court intervenes, not for the sake of the party, but for the public good."

So, in this case, it is not the merit of either party to this action, but rather the public morals that moves the court to denounce the Mexican divorce and the Connecticut marriage ceremonies as nullities.

The learned trial judge's investigation of the law caused him to reach the same conclusion as this court that the Mexican divorce and the Connecticut marriage ceremony were null and void, and these conclusions were carried into the journal as findings.  The court was of the opinion that the application of the principle of in pari delicto prevented any decree of any sort based on these findings. We agree that no relief on any private claim or demand should be awarded, but are of the opinion that a decree should be entered on these findings declaring the Connecticut marriage ceremony null and void in the State of Ohio, and that no marriage relation exists between these parties in Ohio by reason thereof.

The judgment of the Court of Common Pleas is modified by decreeing the status of the parties as aforesaid.  In all other respects the decree denying relief to the parties on their respective claims against one another is affirmed.

HILDEBRANT, J., concurs.

ROSS, P. J., (Dissenting):

I fully concur with my colleagues in their conclusion that the divorce in Mexico cannot have the effect of dissolving a marital status, created and recognized by one of the United States.  I also agree that the defendant, therefore, never acquired a status which would permit her to enter into a legal marriage state with the plaintiff.  As far as the parties to the present litigation are involved, they are in the same position as if no divorce decree had ever been entered by a Mexican court and no marriage ceremony had ever been performed thereafter between them.

The defendant has been guilty of bigamy and the plaintiff being fully cognizant of all the facts involved has been an accessory

to her crime. He is equally guilty with her in any dereliction, whether legal or merely social.

He knew of the Mexican divorce before entering into their present status. He offered to pay the expenses of this Mexican divorce. He is charged with full knowledge of its illegality, just as she is so charged with knowledge of the law. He now seeks the aid of a court of justice, which, while not directly descended from courts of chancery, exercises in its administration of justice the same principles recognized by that court of equity. The law of divorce finds its early history in the Ecclesiastical Courts which certainly administered a justice not inferior in its quality of equity to those of the Chancellor, who borrowed largely from the Courts of the Church in the development of what we today call equity jurisprudence.

I am not unaware that some of the courts of this nation have seen fit to ignore principles recognized both by the Chancellor and the Courts of the Church, that he who comes into equity must come into equity with clean hands, and that he who seeks equity must do equity. Such courts also ignore a principle not only recognized by Courts of Chancery and the Church, but also Courts of law, that the law will not permit its service of justice to be employed by those who are in pari delicto.

It seems strange indeed to find a court which refuses contribution among joint tort feasors opening its doors to one who has contributed to a status which the criminal code of the state recognizes as a violation of law.

It is said the law does not consider the parties involved, but the rights of society only. How the rights of society can be protected by granting the relief here prayed for is so obscure that giving the relief upon such a basis seems but a poor evasion of rules which have everything in their favor to recommend their observance.

It is said that these courts which base their affirmative action upon the theory that the interests of the public and society will be furthered will not, however, grant relief where such relief includes a change in the status of property rights. If the necessity to protect society is so great, why should the fact that the plaintiff profits by the divorce by having interests in property determined deter the courts from their desire to benefit the public? Is the interest of society any less merely because the plaintiff profits in some material fashion by the divorce? The answers to these questions seem to show the fallacy of the position of such courts.

The parties are not now married. Nothing that the court may say may make them less so. The only purpose secured by granting the plaintiff a decree is to permit him to remarry without any cloud upon that right. This is want he wants The action of this court does not give him that right, it merely recognizes that right.

What principle of justice or consideration for society or benefit to the public may urge the exercise of such futile action?

The statute of Ohio does, it is true, recognize the continued existence of a previous marriage as a ground for divorce. The anomoly thus provided for demonstrates its own absurdity, since obviously if one or both of the parties are still married, the second marriage is a nullity and can create no legal status of marriage.

The petition here considered may be considered to warrant an annullment. This, of course, is an action peculiar to chancery and what has been said applies more strongly to this action than to that of divorce.

The Ohio courts have so far not followed the decisions noted in the majority opinion. No case seems to have arisen calling for such action. The decision of the trial court was the first in Ohio directly upon the subject. This state is not bound to follow the distorted conception of public policy contained in the action of our sister states. The trial court wisely refrained from such action.

It seems to me that the granting of a divorce to the plaintiff under the present circumstances not only fails to serve society or conserve the interests of the public, but, on the contrary, is a flagrant invitation to others to violate the law, cohabit in an unlawful state, and when tired of such situation, apply to a court of justice for a release from the indicia of the marriage status.

Such an attitude on the part of the court protects neither the welfare or morals of society. It is my conception that courts of justice are not established and maintained for the purpose of granting relief to those who have violated the laws of the jurisdiction in which they function.

It is my conclusion that both considerations of justice and the interest of society require that neither party to the action should be granted any relief, whether property rights are involved or not, and that the petition and cross-petition should be dismissed, and the judgment of the trial court affirmed.